O

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA
# SOUTHERN DIVISION

| | |
|---|---|
| MATTHEW EDINGER,<br><br>    Plaintiff,<br><br><br>    vs.<br><br>CITY OF WESTMINSTER, ET AL.,<br><br>    Defendants. | Case No.: SA CV 14-0145-DOC (RNBx)<br><br><br><br>ORDER RE: MOTIONS FOR SUMMARY JUDGMENT [47] [48] [49] |

Before the Court are Defendant City of Westminster's Motion for Summary Judgment or, in the Alternative, Partial Summary Judgment ("City Motion") (Dkt. 47); Defendant William Collins' Motion for Summary Judgment or, in the Alternative, Partial Summary Judgment ("Collins Motion") (Dkt. 48); and Defendant Dan Schoonmaker's Motion for Summary Judgment or, in the Alternative, Partial Summary Judgment ("Schoonmaker Motion") (Dkt. 49).

## I.     Facts

Plaintiff Matthew Edinger ("Edinger" or "Plaintiff"), a police officer for the City of Westminster ("the City"), has asserted one claim under 42 U.S.C. § 1983 for First Amendment Retaliation against the City, William Collins ("Collins"), and Dan Schoonmaker ("Schoonmaker") (collectively, "Defendants"). Generally, Plaintiff claims Defendants violated his First Amendment rights by retaliating against him for, *inter alia*, giving a statement as part of an Internal Investigation concerning another police officer's discrimination claim, giving deposition testimony in a discrimination lawsuit against the City, and filing this lawsuit.

Plaintiff began working for the City in 1997. Schoonmaker Statement of Uncontroverted Facts and Conclusions of Law ("Schoonmaker SUF") (Dkt. 49-1) No. 1. Plaintiff still works for the City as a police officer. Plaintiff received his first special assignment – working in the Metro Unit – in 2002. *See* Plaintiff's Statement of Genuine Disputes in Support of Plaintiff's Opposition to Defendant Dan Schoonmaker's  Motion for Summary Judgment ("SGD Re: Schoonmaker Motion") No. 146. Plaintiff then worked in the TARGET Unit between 2003 and 2005. *Id.* However, throughout his career, Plaintiff has not been selected for assignments he applied for. Schoonmaker SUF No. 2.

From May 2005 through September 2005, Plaintiff worked in the Special Investigations Unit ("SIU"). *See* SGD Re: Schoonmaker Mot. No. 146. While working in the SIU, Plaintiff contends he witnessed SIU detectives and sergeants engaging in criminal and administrative misconduct, which included knowingly failing to work hours for which they were paid. SGD Re: Schoonmaker Mot. Nos. 143, 144. Plaintiff asserts he reported these issues to then-Captain and Acting Chief Ronald Coopman ("Coopman"), who ultimately transferred Plaintiff out of SIU. *Id.* No. 145. Plaintiff asserts he reported this alleged misconduct to Lieutenants Albert

Panella ("Panella") and Timothy Vu ("Vu") in 2005 after he was transferred from the SIU, to Lieutenant Collins on more than one occasion between 2005 and 2012, and to then-Lieutenant, now-Chief of Police Kevin Baker ("Baker") in about 2007 or 2008. *See* Opp'n to City at 2.[1]

Plaintiff has not been selected for a detective position in the ten years since he left the SIU. SGD Re: Schoonmaker Mot. No. 146. In 2012, Plaintiff states he approached Coopman in the locker room about whether Chief Coopman[2] thought Plaintiff could have a fair shot at getting a detective position (in particular, a narcotics position). Edinger Depo. (Dkt. 73) at 62:19–25, 63:13–17. Plaintiff alleges Coopman responded, "You think you have paid your penance?" *Id.* at 63:1–2.

### A. Internal Affairs Investigation of Officer Reyes' Complaint

Plaintiff is friends with Officer Ryan Reyes ("Reyes"), and contends this friendship is well known within the Westminster Police Department ("WPD"). SGD Re: Schoonmaker Mot. Nos. 152, 153. In February 2010, Reyes filed a complaint with the Department of Fair Employment and Housing ("DFEH") alleging he was being discriminated against by various supervisors at the WPD, including Sergeant Cliff Williams ("Williams"), on the basis of his race. Schoonmaker SUF Nos. 3, 4. The WPD initiated an Internal Affairs ("IA") investigation into Reyes' complaint. *Id.* No. 5. As part of the IA investigation into Reyes' complaint, the WPD interviewed about 15 officers, including Plaintiff Edinger. *Id.* Nos. 6, 10. Officers at the WPD who are identified as possibly having information related to a pending IA investigation are required to attend an IA interview and answer all questions truthfully. *Id.* No. 7. Plaintiff was therefore expected to attend his interview and truthfully answer all the questions posed to him. *Id.* No. 11. Sergeant Darrin Upstill ("Upstill") conducted Plaintiff's interview in July 2010. Because officers are paid for the time they spend in IA interviews, Plaintiff was paid for the time he spent in the IA interview. *Id.* No. 12.

---

[1] Defendants dispute the timing of Plaintiff's complaints and that Plaintiff said anything about this misconduct to Collins between 2006 and 2010. *See* City Reply at 7–8.
[2] Coopman was appointed Interim Chief of Police on December 31, 2010 and was appointed Chief of Police of March 21, 2011. He retired on July 31, 2012. Defs. Appendix of Evidentiary Support (Dkt. 51) Ex. C ("Declaration of Ron Coopman") ¶¶ 2–3.

Reyes alleged in his complaint, *inter alia*, that Williams had been making it a point to arrive on the scene to follow up on him and watch him when Reyes stopped female suspects. *See* Declaration of Matthew Edinger ("Edinger Decl.") (Dkt. 59) Ex. 3 ("Transcript of IA Interview") at 4. In his IA interview concerning Reyes' complaint, Plaintiff Edinger stated he did not notice Williams would "show up on calls" more for Reyes than for other officers. *Id.* at 15–16. Plaintiff Edinger further commented that Williams follows up on Edinger and that "[Williams is] pretty consistent on staying busy and just following people up." *Id.* at 11–12. Plaintiff Edinger also stated Reyes told him that Williams would show up "as soon as a female gets run or goes out on the air." *Id.* at 11; *see also id.* at 5–6. During his interview, Plaintiff Edinger specifically described an incident in which Reyes asked Plaintiff to "watch for" Williams on a particular call during which Reyes pulled over a woman. *Id.* at 13–15. Plaintiff stated he saw Williams show up on that occasion. *Id.* Plaintiff contends his statements to Upstill corroborated Reyes claims of harassment and discrimination. SGD Re: Schoonmaker Motion No. 157. However, the WPD relied on Plaintiff's July 2010 statement to conclude Williams did not harass Reyes by singling him out. Schoonmaker SUF No. 15.

In October 2010, Sergeant Cynthia Sweasy ("Sweasy") gave Edinger a supervisor's log for allegedly failing to conduct *Miranda* interviews. *Id.* No. 24.

Over the course of the next couple of years, Plaintiff was not selected for various special assignments and promotions. Plaintiff contends that, in November 2010, Schoonmaker and Vu interviewed Plaintiff and other candidates for Corporal; Plaintiff was not selected. SGD Re: Schoonmaker Mot. Nos. 150, 151. Plaintiff further contends he was denied the Corporal position again in 2011 and that Schoonmaker told him he did not receive the position because he was "too pro-patrol." *Id.* No. 153.

In March 2012, then-Chief Coopman selected Officer Kyle Seasock ("Seasock") for a narcotics assignment for which Edinger also applied. Schoonmaker SUF Nos. 46, 47. The command staff – Collins, Schoonmaker, Panella, and Vu – had recommended that Coopman select Seasock. In October 2012, Baker, who had become Chief of Police, selected Anil Adam for an auto theft special assignment. *Id.* No. 54. Edinger had also applied for this position. *Id.*

The command staff – Collins, Schoonmaker, Panella, and Lieutenant Derek Marsh ("Marsh") –
had recommended Adam.

Plaintiff contends that, in November 2012, Sergeant Donald Webb hid Plaintiff's
assigned vehicle on two occasions and purposely assigned Plaintiff the worst car in the fleet.
SGD Re: Schoonmaker Motion No. 169. Plaintiff asserts that shortly after those incidents
Sergeant Cameron Knauerhaze paged Plaintiff over the intercom in a demeaning and
inappropriate fashion. *Id.* No. 170.

Plaintiff alleges that on November 7, 2012, he reported to Panella he was suffering
retaliation for reporting what he observed in the SIU in 2005. Edinger Decl. ¶ 31.

### B. The Flores Lawsuit

Officer Reyes, along with Officers Jose Flores and Brian Perez, filed a separate
discrimination and retaliation lawsuit against the City and various Chiefs of Police, including
Chief Baker.[3] Schoonmaker SUF No. 58. As part of that lawsuit, Plaintiff Edinger and about 16
other current City employees and seven former City employees were deposed. *Id.* No. 59.
Edinger was served with a deposition subpoena and then deposed on November 20, 2012. *Id.*
No. 65. Panella was present during the deposition and Baker was an individual defendant in the
case. Edinger Decl. ¶ 32. Plaintiff states Panella tried to contact him about his deposition before
it happened, stating the Department would appreciate cooperation, but that Plaintiff refused to
speak with Panella or the City representatives about the deposition. *Id.*

In his deposition, Edinger testified that, *inter alia*, Reyes believed he was being
retaliated against after filing a complaint and that Edinger saw things that led him to believe
such retaliation was occurring. Edinger Decl. Ex. 4 ("Edinger Deposition in *Flores* case") at 8–
9. Edinger also testified about what he observed in the SIU and that he complained to Coopman
and Panella about that conduct. *Id* at 10–15. Plaintiff describes his testimony as "highly
critical" of the Department. Edinger Decl. ¶ 33.

---

[3] The Court takes judicial notice of the Complaint in *Flores, et al. v. City of Westminster, et al.*, Federal District Court Case
No. SA CV 11-0278-DOC (RNBx), the First Amended Complaint in the *Flores* case, and the Special Verdict Form in the
*Flores* case. *See* Fed. R. Evid. 201; *Harris v. Cnty. of Orange*, 682 F.3d 1126, 1132 (9th Cir. 2012) (noting the court may
take judicial notice of "undisputed matters of public record," including "documents on file in federal or state courts").

Around October 2012, Edinger applied for a position on the Trauma Support Team. Schoonmaker SUF No. 60. Chief Baker accepted the command staff's – Collins, Schoonmaker, Panella, and Marsh – recommendation and selected Jerad Kent ("Kent") and Alan Aoki ("Aoki") for the Trauma Support Team. *Id.* No. 79. Five people applied for the position, three "sworn" individuals and two "non-sworn." SGD Re: Schoonmaker Mot. No. 192. Edinger was the only "sworn" employee not selected. *Id.* No. 193.

### C. Edinger's Tort Claim and Lawsuit

On May 28, 2013, Edinger filed a tort claim against the City. Schoonmaker SUF No. 84. In December 2013, Edinger filed the instant lawsuit against the City, Collins, Schoonmaker, Panella, and Coopman in state court. *Id.* No. 85.

After Edinger filed the lawsuit, two incidents occurred. First, in January 2015, an officer complained to Collins about Edinger's conduct. *See id.* Nos 115, 116, 117. Collins gave the information to Schoonmaker and Baker, and Baker forwarded the information to the District Attorney's ("D.A.") office. *Id.* Nos. 118, 120. The D.A. decided not to charge Edinger with criminal conduct. *Id.* No. 121. Schoonmaker was not involved in the decision to forward this information to the DA's office. *Id.* No. 124.

Second, Plaintiff received a written reprimand in June 2015 based on an outside investigation into a complaint that he made discriminatory comments. SGD Re: Schoonmaker Mot. No. 200.[4]

### II.   Procedural History

Plaintiff brought suit in Orange County Superior Court on December 16, 2013. Notice of Removal (Dkt. 1) Ex. A. The case was removed to federal court on January 31, 2014. *Id.*

Defendants each filed a Motion for Summary Judgment on October 26, 2015. Plaintiff opposed all three motions on November 16, 2015 (Dkts. 55, 56, 57). Each of the three Defendants replied on November 23, 2015 (Dkts. 64, 66, 71).

---

[4] The Court has omitted from the statement of facts alleged employment actions not addressed by Plaintiff in his Oppositions.

### III.    Summary Judgment Under Rule 56

Summary judgment is proper if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment is to be granted cautiously, with due respect for a party's right to have its factually grounded claims and defenses tried to a jury. *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). A court must view the facts and draw inferences in the manner most favorable to the non-moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1992); *Chevron Corp. v. Pennzoil Co.*, 974 F.2d 1156, 1161 (9th Cir. 1992). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact for trial, but it need not disprove the other party's case. *Celotex*, 477 U.S. at 323. When the non-moving party bears the burden of proving the claim or defense, the moving party can meet its burden by pointing out that the non-moving party has failed to present any genuine issue of material fact as to an essential element of its case. *See Musick v. Burke*, 913 F.2d 1390, 1394 (9th Cir. 1990).

Once the moving party meets its burden, the burden shifts to the opposing party to set out specific material facts showing a genuine issue for trial. *See Liberty Lobby*, 477 U.S. at 248-49. A "material fact" is one which "might affect the outcome of the suit under the governing law . . . ." *Id.* at 248. A party cannot create a genuine issue of material fact simply by making assertions in its legal papers. *S.A. Empresa de Viacao Aerea Rio Grandense v. Walter Kidde & Co., Inc.*, 690 F.2d 1235, 1238 (9th Cir. 1982). Rather, there must be specific, admissible evidence identifying the basis for the dispute. *Id.* The court need not "comb the record" looking for other evidence; it is only required to consider evidence set forth in the moving and opposing papers and the portions of the record cited therein. Fed. R. Civ. P. 56(c)(3); *Carmen v. S.F. Unified Sch. Dist.*, 237 F.3d 1026, 1029 (9th Cir. 2001). The Supreme Court has held that "[t]he mere existence of a scintilla of evidence . . . will be insufficient; there must be evidence on which the jury could reasonably find for [the opposing party]." *Liberty Lobby*, 477 U.S. at 252.

Discussion

All three Defendants move for summary judgment as to the entire and only claim in this case – First Amendment retaliation under 42 U.S.C. § 1983. In the alternative, each Defendant requests that the Court grant partial summary judgment as to the following issues:

> what part of Edinger's claim is barred by the statute of limitations; (2) what alleged speech activity is not protected by the First Amendment; and (3) which adverse actions can be eliminated due to lack of causation and/or in light of evidence that Defendants would have taken the same action in the absence of Edinger's speech.

City Mot. at 25; Collins Mot. at 25; Schoonmaker Mot. at 25.

As noted above, Plaintiff brings a claim under Section 1983 for violations of his constitutional rights. In particular, Edinger claims Defendants violated his First Amendment rights by retaliating against him for, *inter alia*, giving a statement as part of the IA investigation concerning Reyes' discrimination claim, giving deposition testimony in the *Flores* lawsuit against the City, and filing this lawsuit. Section 1983 provides:

> Every person who, under color of any statute . . . of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured . . . .

To prove a violation under Section 1983, Plaintiff must show that: (1) Defendants' conduct deprived Plaintiff of a right, privilege or immunity secured by the Constitution or laws of the United States, and (2) Defendants committed the act under color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988).

### A. Municipal Liability Under *Monell*

To hold a city liable under Section 1983 for violating constitutional rights, a plaintiff must establish liability under *Monell v. Dep't. of Soc. Servs. of City of New York*, 436 U.S. 658 (1978). Therefore, before delving into the substance of Plaintiff's claims,

the Court must first determine to what extent Defendant City of Westminster may be held liable for the actions of its employees.

"[M]unicipalities may be held liable as 'persons' under § 1983 'when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent the official policy, inflicts the injury." *Price v. Sery*, 513 F.3d 962, 966 (9th Cir. 2008) (quoting *Monell*, 436 U.S. at 691). A plaintiff may also establish municipal liability by demonstrating: "(1) the constitutional tort was the result of a 'longstanding practice or custom which constitutes the standard operating procedure of the local government entity;' (2) the tortfeasor was an official whose acts fairly represent official policy such that the challenged action constituted official policy; or (3) an official with final policy-making authority 'delegated that authority to, or ratified the decision of, a subordinate.'" *Id.* (quoting *Ulrich v. City & Cty. of San Francisco*, 308 F.3d 968, 984–85 (9th Cir. 2008)); *see also Gillette v. Delmore*, 979 F.2d 1342, 1346–47 (9th Cir. 1992).

To determine whether Plaintiff has established that an official with final policymaking authority delegated that authority to a subordinate, the Court must first ascertain which City of Westminster official has final policymaking authority. The Supreme Court held that "the identification of policymaking officials is a question of state law." *St. Louis v. Praprotnik*, 485 U.S. 112, 124 (1988). Accordingly, the Court must look to California law to determine whether any of the individual Defendants had "final policymaking authority." California state law allows municipalities to create a "city manager" form of governance. Gov. Code § 34851; *see also Ellins v. City of Sierra Madre*, 710 F.3d 1049, 1066 (9th Cir. 2013). The City of Westminster has done so. *See* Westminster Mun. Code § 2.08.010. The Westminster Municipal Code provides that the City Manager shall, *inter alia*, "have the power to control, order and give directions to all heads of departments, subordinate officers and employees of the city . . . ." *Id.* § 2.08.040(B). "The city manager shall also have the power to appoint, promote, discipline, demote and remove any officers and employees of the city, except the city attorney." *Id.* § 20.08.040(C). As the Court previously concluded, *see* Order Granting in Part and Denying in

Part Motion to Dismiss Plaintiff's Second Amended Complaint ("Second MTD Order") (Dkt. 29) at 10, these ordinances establish that the City Manager possesses "final policymaking authority" over employment decisions in the Westminster Police Department. *See Ellins*, 710 F.3d at 1066.

In its Oppositions, Plaintiff does not dispute that the City Manager has final policymaking authority. However, he argues the City Manager delegated final policymaking authority concerning special assignments and collateral duties in the Police Department to the Chief of Police. As stated above, "final policymaking liability may attach to the City if it can be shown that it "delegated [its final policymaking authority] to, or ratified the decision, of a subordinate." *Hansen v. City of San Francisco*, No. 12-CV-04210-JST, 2014 WL 1310282, at *9 (N.D. Cal. Mar. 31, 2014) (quoting *Ulrich*, 308 F.3d at 986). As the Ninth Circuit held in *Ulrich*, "[a]n official may be found to have been delegated final policymaking authority where 'the official's discretionary decision is [not] constrained by policies not of that official's making' and . . . [not] subject to review by the municipality's authorized policymakers." *Ulrich*, 308 F.3d at 986 (quoting Christie *v. Iopa*, 176 F.3d 1231, 1236–37 (9th Cir.1999)).

The Westminster Municipal Code, which states the City Manager has the authority to promote and appoint officers, does not address whether the City Manager has the power to delegate those powers, or aspects of those powers, to the Chief of Police. In support of its argument that the City Manager delegated his authority, Plaintiff points to Chief Baker's deposition testimony. Baker testified he does not need the City's approval for "collateral assignments." Declaration of Joseph N. Bolander ("Bolander Decl.") (Dkt. 58) Ex. A ("Baker Deposition") at 46:13–25. Further, when asked if he had to "run it by the City" when filling a special assignment position, Baker stated that, "Not that one, no. If it was new, where I need to acquire funding or if it's a position we froze for financial reasons, then I would have had to ran this by the city manager." *Id.* at 33:25–34:5. Baker was then asked, "if it's simply a vacant position that's funded you have carte blanche to put whoever you want in it, correct?" *Id.* at 34:6–8. Baker responded yes. *Id.* at 34:9. Unlike in *Swanberg v. Canby*, No. 3:14-CV-00882-HZ, 2015 WL 5254373 (D. Or. Sept. 9, 2015), Baker did not testify he had to make decisions

about collateral assignments or certain special assignment positions "in coordination with an official who has power over him." *Id.* at \*14 (internal quotation marks omitted). Based on this testimony, it does not appear the Chief of Police's decisions about collateral assignments and certain special assignments are subject to review by the City Manager. *See Ulrich*, 308 F.3d at 986.

Further, City Manager Eddie Manfro declares he "was not responsible for, and had no participation in" the employment actions alleged by Edinger, including the decision not to select Edinger for the Trauma Support Team in December 2012. Defs. Appendix of Evidentiary Support (Dkt. 51-4) Ex. K ("Declaration of Eddie Manfro") ¶¶ 6, 8. Manfro also declares he did not ratify any of the actions or decisions alleged by Edinger. *Id.* ¶¶ 6, 7, 9. These statements, read in conjunction with Baker's testimony, suggest the City Manager has delegated final policymaking authority with respect to certain personnel decisions to the Chief of Police.

Accordingly, the Court concludes this is sufficient evidence to create a genuine issue of material fact as to whether the City Manager delegated to the Chief of Police the final policymaking authority to make certain personnel decisions for officers under his command. The City may therefore be liable if the Chief of Police took certain actions to punish Plaintiff for exercising his First Amendment rights. However, the City is entitled to summary judgment to the extent the Chief of Police did not participate in the alleged violation. *See Haase v. City of Sparks*, No. 3:09-CV-636-RCJ-WGC, 2012 WL 607451, at \*5 (D. Nev. Feb. 23, 2012).

### B.  Legal Standard for First Amendment Retaliation

"The First Amendment shields public employees from employment retaliation for their protected speech activities." *Hagen v. City of Eugene*, 736 F.3d 1251, 1257 (9th Cir. 2013). However, courts have recognized that "the State's interests as an employer in regulating the speech of its employees" require them to balance the interests of the public employee as a citizen in commenting upon matters of public concern against the interest of the State as an employer in promoting the efficiency of public services. *Id.* (quoting *Karl v. City of Mountlake Terrace*, 678 F.3d 1062, 1068 (9th Cir. 2012)) (internal quotation marks omitted).

To arrive at the proper balance when evaluating a First Amendment retaliation claim, the Court asks "a sequential five-step series of questions." *Eng v. Cooley*, 552 F.3d 1062, 1070 (9th Cir. 2009). First, the Court considers whether the plaintiff has engaged in protected speech activities, "which requires to plaintiff to show that the plaintiff: (1) spoke on a matter of public concern; and (2) spoke as a private citizen and not within the scope of her official duties as a public employee." *Karl*, 678 F.3d at 1068. If the plaintiff makes these two showings, the Court asks whether the plaintiff "has further shown that she (3) suffered an adverse employment action, for which the plaintiff's protected speech was a substantial or motivating factor." *Id.* If the plaintiff meets her burden as to the first three steps, "thereby stating a prima facie claim of First Amendment retaliation, then the burden shifts to the government to escape liability by establishing either that: (4) the state's legitimate administrative interests outweigh the employee's First Amendment rights; or (5) the state would have taken the adverse employment action even absent the protected speech." *Id.* "[A]ll the factors are necessary, in the sense that failure to meet any one of them is fatal to the plaintiff's case." *Dahlia v. Rodriguez*, 735 F.3d 1060, 1067 n.4 (9th Cir. 2013) (en banc).

"The precise nature of the retaliation is not critical to the inquiry in First Amendment retaliation cases." *Coszalter v. City of Salem*, 320 F.3d 968, 974–75 (9th Cir. 2003). The goal is "to prevent, or redress, actions by a government employer that chill the exercise of First Amendment rights." *Id.* (quoting *Rutan v. Republican Party*, 497 U.S. 62 (1990)) (internal quotation marks omitted). Many different types of employment actions may have an impermissible chilling effect. "Depending on the circumstances, even minor acts of retaliation can infringe on an employee's First Amendment Rights." *Id.* at 975.

### 1. Time-Barred Adverse Actions and Allegations not Properly before the Court

As a preliminary matter, the Court notes it previously held that any adverse employment action that occurred before May 28, 2011 cannot form the basis of recovery in this case. Order Granting in Part and Denying in Part Motion to Dismiss Third Amended Complaint ("Third

MTD Order") (Dkt. 37) at 5.[5] However, the Court also held that "facts pleaded outside the statute of limitations are still relevant to intent and motive and, therefore, will not be stricken." *Id.* Therefore, in accordance with its prior ruling, the Court will only consider facts outside the statute of limitations for purposes of establishing intent and motive and putting timely filed claims in context. *See Carpinteria Valley Farms, Ltd. v. Cnty. of Santa Barbara*, 344 F.3d 822, 829 (9th Cir. 2003) (facts outside the statute of limitations can "establish motive and . . . [put] timely-filed claims in context"); *see also Lopez v. City & Cnty. of San Francisco*, No. 12-CV-06523-MEJ, 2014 WL 2943417, at *5 (N.D. Cal. June 30, 2014), *appeal dismissed* (Oct. 15, 2014).

The Court must also determine whether facts not pleaded in the Third Amended Complaint ("TAC") (Dkt. 30) can be considered in deciding whether Plaintiff has established a prima facie case of First Amendment retaliation. In particular, Plaintiff asserts he witnessed criminal and administrative misconduct when he worked in the SIU from May 2005 to September 2005. Opp'n to Schoonmaker at 2; Opp'n to Collins at 2; Opp'n to City at 2. Plaintiff contends he engaged in protected speech by reporting this conduct and was retaliated against for it. Opp'n to Schoonmaker at 2; Opp'n to Collins at 2; Opp'n to City at 2. In the TAC, Plaintiff does not allege he engaged in protected activity by complaining about incidents he witnessed during his assignment in the SIU. Therefore, Plaintiff does not allege his speech concerning what he witnessed in the SIU caused the retaliation. Because these allegations have not been properly pleaded, they are not properly before the Court. Accordingly, because Plaintiff's complaint does not allege this speech caused the retaliation, the Court will not consider whether this speech constitutes protected speech. *See Thomas v. City of Beaverton*, 379 F.3d 802, 808 n.2 (9th Cir. 2004) ("We do not consider whether Thomas' speech in her addenda is protected speech, because her complaint does not allege that the two addenda caused the retaliation.").

---

[5] *See Campos v. City of Irwindale*, 593 F. App'x 703, 703 (9th Cir. 2015) (Mem.) ("The district court properly excluded the asserted adverse employment actions that occurred before July 5, 2015, due to California's two-year statute of limitations for § 1983 claims.") (citation omitted).

Excluding Plaintiff's contention that he engaged in speech protected by the First Amendment when he reported alleged misconduct in the SIU, Plaintiff alleges three episodes of protected speech: (1) making a statement in the July 2010 IA interview concerning Reyes' DEFH claim; (2) providing deposition testimony in November 2012 in *Flores v. City of Westminster, et al.* ("the *Flores* case"); and (3) filing this lawsuit in December 2013.

The Court will consider Defendants' arguments concerning each alleged episode of protected speech and whether Plaintiff was retaliated against for such speech in turn7.

### 2.   July 2010 Internal Investigation Interview

Defendants argue Plaintiff did not engage in protected activity when he gave a statement in July 2010 as part of the IA investigation into Reyes' discrimination claims because he did not speak on a matter of public concern and spoke as a public employee. Defendants also argue that most of the adverse actions Plaintiff alleges after July 2010 are time-barred or not adverse, and that Plaintiff cannot prove his July 2010 statement was a substantial or motivating reason for any adverse actions. The Court will address each argument in turn.

### a.  Matter of Public Concern

"Whether an employee's speech addresses a matter of public concern is a pure question of law that must be determined 'by the content, form, and context of a given statement, as revealed by the whole record." *Karl*, 678 F.3d at 1069 (quoting *Connick v. Myers*, 461 U.S. 138, 147–48 & n.7 (1983)). Out of these three factors, "the content of the speech is generally the most important." *Id.* (citing *Clairmont v. Sound Mental Health*, 632 F.3d 1091, 1103 (9th Cir. 2011)). The Ninth Circuit does not apply a rigid, multi-factor analysis to determine what speech is of public concern; rather, courts perform a "generalized analysis of the nature of the speech," to place the speech on "a continuum ranging from matters of public concern to matters of purely personal concern." *Clairmont*, 632 F.3d at 1103. On one end of that spectrum is speech that relates to matters of concern to the community, including political or social matters. *Eng*, 552 F.3d at 1070. On the other end are individual grievances and personnel disputes that are irrelevant to the public's evaluation of government agencies. *Id.*

"In a close case, when the subject matter of a statement is only marginally related to issues of public concern, the fact that it was made because of a grudge or other private interest or to co-workers rather than to the press may lead the court to conclude that the statement does not substantially involve a matter of public concern." *Desrochers v. City of San Bernadino*, 572 F.3d 703, 710 (9th Cir. 2009) (quoting *Johnson v. Multnomah Cnty., Or.*, 48 F.3d 420, 425 (9th Cir. 1995)); *see also Alpha Energy Savers, Inc. v. Hansen*, 381 F.3d 917, 925 (9th Cir. 2004) (quoting the "close case" language of *Johnson*, but deciding that "[t]his is . . . not a close case"); *Roe v. City and Cnty. Of San Francisco*, 109 F.3d 578, 586 (9th Cir. 1997) (applying the "close case" language of *Johnson*).

The Court must determine whether Edinger's speech in the 2010 IA investigation interview concerning Reyes' claims of discrimination and harassment was a matter of public concern. Defendants assert that, in the 2010 IA investigation interview, Plaintiff did not report discrimination or retaliation and his speech related to Williams' supervisory habits and was used to exonerate Williams rather than to support Reyes' claims. Schoonmaker Mot. at 7; Collins Mot. at 7; City Mot. at 12. Defendants also note the speech was not made to a public audience, but in the privacy of an IA interview and the point of the speech was to truthfully answer investigation questions. Schoonmaker Mot. at 7; Collins Mot. at 7; City Mot. at 12. Therefore, Defendants argue the speech was not on a matter of public concern as a matter of law.

In *Harris v. Bear Valley Cmty. Serv. Dist.*, No. 1:12-CV-01664-JLT, 2013 WL 4402823, (E.D. Cal. Aug. 14, 2013) the court concluded that, "[b]ecause Plaintiff's speech involved allegations of discriminations by BVPD officers, her speech was a matter of public concern. *Id.* at *7; *see Alpha Energy Savers*, 381 F.3d at 927; *id.* at 924 ("[W]hen government employees speak about corruption, wrongdoing, misconduct, wastefulness, or inefficiency by other government employees . . . their speech is inherently a matter of public concern."). Analogous to the situation here, the *Harris* plaintiff alleged she "engage[ed] in protected speech [b]y partaking in an investigation within the Department" and "provided testimony, interviews, assisted and fully cooperated with the Internal Investigation of allegations of pregnancy

discrimination and retaliation against Chief Freeman and others." *Harris*, 2013 WL 4402823, at *7 (internal quotation marks and citations omitted). Because Plaintiff's speech in the IA interview involved allegations of discrimination by WPD officers, the Court concludes this speech was a matter of public concern.

The WPD's conclusion that Plaintiff's statement did not support Reyes' discrimination claim is not determinative of whether Plaintiff's speech is entitled to protection.[6] The critical fact for purposes of the public concern inquiry is not that WPD relied on Plaintiff's statement to conclude Williams did not harass Reyes, but rather that Plaintiff made his statement in the context of an investigation within the WPD in which potential discrimination and harassment were at issue. *See Alpha Energy Savers*, 381 F.3d at 927 ("[w]e hold that a public employee's testimony addresses a matter of public concern if it contributes in some way to the resolution of a judicial or administrative proceeding in which discrimination . . . is at issue – even if the speech itself would not otherwise meet the *Connick* test were we to consider it in isolation.").

### b.  Speaking in the Capacity of a Private Citizen

"A public employee's speech is not protected by the First Amendment when it is made pursuant to the employee's official job responsibilities." *Karl*, 678 F.3d at 1071 (citing *Garcetti v. Ceballos*, 547 U.S. 410, 426 (2006)). A statement is made "in the speaker's capacity as citizen if the speaker 'had no official duty' to make the questioned statements, or if the speech was not the product of 'performing the tasks the employee was paid to perform.'" *Eng*, 552 F.3d at 1071 (quoting *Posey v. Lake Pend Oreille School Dist. No. 84*, 546 F.3d 1121, 1127 n.2 (9th Cir. 2008)).

In evaluating whether a plaintiff spoke as a private citizen, courts must look to the plaintiff's employment responsibilities. If there is "an official duty to utter the speech at issue, then the speech is unprotected." *Id.* The Ninth Circuit has recognized that, "because of the fact-intensive nature of the inquiry, no single formulation of factors can encompass the full set of

---

[6] As noted above, in his IA interview, Plaintiff stated that Reyes told him Williams would show up soon after Reyes ran a female suspect through the system, and described a situation in which Williams did in fact show up. Plaintiff also stated he did not notice Williams would show up on calls more for Reyes than for other officers.

inquiries relevant to determining the scope of a plaintiff's job duties." *Dahlia*, 735 F.3d at 1074.

In assessing whether there is an official duty to speak within the context of "a highly hierarchical employment setting such as law enforcement," a relevant factor is "whether or not the employee confined his communications to his chain of command." *Id.* at 1074. "When a public employee communicates with individuals or entities outside of his chain of command, it is unlikely that he is speaking pursuant to his duties." *Id.*

In addition, the subject matter of the communication is also relevant to the determination of whether the speech is protected by the First Amendment. *Id.* at 1074–75. When a report is prepared "pursuant to normal departmental procedure, about a particular incident or occurrence, the employee's preparation of that report is typically within his job duties." *Id.* at 1075. *See Garcetti*, 547 U.S. at 421 (holding that a deputy district attorney's preparation of a memorandum regarding the merits of a particular case was not protected speech because preparation of such memoranda was a routine part of what he "was employed to do"); *Freitag v. Ayers*, 468 F.3d 528, 546 (9th Cir. 2006) (holding that a correctional officer's "internal reports of inmate sexual misconduct" were not constitutionally protected speech). "By contrast, if a public employee raises within the department broad concerns about corruption or systemic abuse, it is unlikely that such complaints can reasonably be classified as being within the job duties of an average public employee, except when the employee's regular job duties involve investigating such conduct, e.g., when the employee works for Internal Affairs or another watchdog unit." *Dahlia*, 735 F.3d at 1075.

Finally, "when a public employee speaks in direct contravention to his supervisor's orders, that speech may often fall outside of the speaker's professional duties." *Id.* "[T]he fact that an employee is threatened or harassed by his superiors for engaging in a particular type of speech provides strong evidence that the act of speech was not, as a 'practical' matter, within the employee's job duties notwithstanding any suggestions to the contrary in the employee's formal job description." *Id.*

Defendants argue Plaintiff did not speak as a private citizen in the IA interview because he was interviewed as part of his official duties, he did not raise broad concerns about corruption or systemic abuse, and did not speak in direct contravention of his supervisor's orders. Based on the evidence before it, the Court concludes Plaintiff has not demonstrated that giving a statement as part of the IA investigation of Reyes' claims was outside of his official duties. Although Plaintiff argues he was requested, not ordered, to give a statement, Plaintiff does not dispute that officers at the WPD who are identified as possibly having information related to a pending IA investigation are required to attend an IA interview and answer all questions truthfully. Schoonmaker SUF No. 7. Nor does Plaintiff dispute police officers are compensated for time spent in IA interviews and that he was paid his normal wages to attend the interview. *Id.* Nos. 9, 12.

In addition, the Court is not convinced Plaintiff communicated with an individual outside of his chain of command. Plaintiff asserts in his Declaration that Sergeant Upstill – who conducted the IA interview – was not in his chain of command. Edinger Decl. ¶ 15. Besides his Declaration, Plaintiff provides no evidence Upstill was not in his chain of command. According to Upstill's Declaration, "[b]ecause I was a Sergeant on July 14, 2010 and Edinger was an officer, I was a supervisor in Edinger's chain of command. Declaration of Darin Upstill ("Upstill Decl.") (Dkt. 51-1) ¶ 8. Further, because Sergeant Upstill requested that Edinger be interviewed as part of the IA investigation, Edinger did not speak in direct contravention of a supervisor's orders by giving the statement. This situation is therefore distinguishable from *Dahlia*, in which the plaintiff defied his supervisor's orders. *See Dahlia*, 735 F.3d at 1075 ("Even assuming *arguendo* that Dahlia might normally be required to disclose misconduct pursuant to his job duties, here he defied, rather than followed, his supervisors' orders."). Finally, although Plaintiff was interviewed as part of the IA investigation of a discrimination claim, it does not appear he raised "broad concerns about corruption or systemic abuses." *Id.* Rather, his speech in the IA interview – in which he described witnessing Williams "follow up on Reyes" – is more akin to a situation in which a public employee prepares a report "pursuant to normal departmental procedure, about a particular incident or occurrence." *Id.*

For the foregoing reasons, the Court concludes Plaintiff has failed to meet this prong of the test. Accordingly, the Court finds Plaintiff did not engage in protected speech activities when he gave a statement in the IA investigation interview. *See Dahlia*, 735 F.3d at 1067 n.4 * ("[A]ll the factors are necessary, in the sense that failure to meet any one of them is fatal to the plaintiff's case."). Therefore, Plaintiff cannot rely on this speech to prove his prima facie case of First Amendment retaliation.

### 3. November 2012 Deposition

The parties do not dispute that Plaintiff's November 20, 2012 deposition testimony in the *Flores* case constitutes protected speech activity. In other words, Defendants do not assert Plaintiff has failed to show that he spoke on a matter of concern and spoke as a private citizen and not within the scope of his official duties as a public employee.

However, Defendants Collins and Schoonmaker argue Edinger cannot prove either of them retaliated against him because of his November 2012 deposition testimony. The City argues the November 2012 deposition was not a substantial or motivating factor in the City's decision not to select him for the Trauma Support Team. The Court therefore will address the disputed issue of causation. To establish the causation element of the First Amendment retaliation claim, Plaintiff must demonstrate a causal link between his deposition testimony in the *Flores* case and the adverse actions he alleges.

As set out above, to state a prima facie claim of First Amendment retaliation, Plaintiff must prove he "suffered an adverse employment action, for which [his] protected speech was a substantial or motivating factor." *Karl*, 678 F.3d at 1068. "To constitute an adverse employment action, a government act of retaliation need not be severe and it need not be of a certain kind." *Dahlia*, 735 F.3d at 1078 (quoting *Coszalter*, 320 F.3d at 975). However, on summary judgment in a First Amendment retaliation case, a plaintiff must provide evidence of materially adverse employment actions that are "reasonably likely to deter protected speech." *Thomas v. Cnty. of Rivserside*, 763 F.3d 1167, 1168 (9th Cir. 2014); *see also Dahlia*, 735 F.3d at 1078.

"To establish that retaliation was a substantial or motivating factor behind an adverse employment action, a plaintiff may introduce evidence that (1) the speech and adverse action were proximate in time, such that a jury could infer that the action took place in retaliation for the speech; (2) the employer expressed opposition to the speech, either to the speaker or to others; or (3) the proffered explanations for the adverse action were false and pretextual." *Ellins*, 710 F.3d at 1062 (citing *Coszalter*, 320 F.3d at 977); *see also Keyser v. Sacramento City Unified Sch. Dist.*, 265 F.3d 741, 750–52 (9th Cir. 2001). Additionally, "[a] defendant's conduct cannot be motivated by a plaintiff's exercise of his First Amendment rights if he is unaware that the plaintiff exercised those rights." *Anselmo v. Mull*, No. 2:12-01422 WBS EFB, 2013 WL 5817560, at *14 (E.D. Cal. Oct. 29, 2013). Therefore, "[t]o survive summary judgment, a plaintiff alleging a First Amendment retaliation claim must produce evidence that the governmental actor had knowledge of his protected speech." *Occhionero v. City of Fresno*, 386 Fed. App'x 745, 745 (9th Cir. 2010); *see also Dowell v. Contra Costa Cnty.*, 928 F. Supp. 2d 1137, 1150–51 (N.D. Cal. 2013); *Alpha Energy Savers*, 381 F.3d at 929.

Plaintiff argues his speech was a motivating factor in the decision to deny Plaintiff the Trauma Support position in December 2012. Opp'n to Schoonmaker at 19.[7] Defendants do not challenge that this decision was an adverse action. *See* Schoonmaker Mot. at 15; City Mot at 19. Therefore, assuming the decision to deny Plaintiff the Trauma Support position was adverse, the Court will turn to the question of whether retaliation was a substantial or motivating factor behind the action.[8]

To prove whether retaliation was a substantial or motivating factor, a plaintiff may introduce evidence that the "speech and adverse action were proximate in time, such that a jury could infer that the action took place in retaliation for the speech." *Ellins*, 710 F.3d at 1062. The Ninth Circuit held that "[d]epending on the circumstances, three to eight months is easily

---

[7] Plaintiff categorizes the denial of the Trauma Support position as a "pre-filing but post-deposition adverse action." *See* Opp'n to City at 23; Opp'n to Schoonmaker at 19. In his Oppositions, Plaintiff does not argue that any other adverse employment actions are connected to his November 2012 deposition testimony.
   Further, the parties do not dispute that alleged adverse employment actions that occurred before May 28, 2011 are time-barred and therefore cannot form the basis of Plaintiff's claim. Therefore, the Court will only discuss the time-barred adverse actions if it determines they are helpful in establishing motive and putting timely filed claims in context.
[8] It is undisputed that no one at the WPD ever directly told Edinger that he or she opposed his November 2012 deposition testimony.

within a time range that can support an inference of retaliation." *Id.* (quoting *Coszalter*, 320 F.3d at 977) (internal quotation marks omitted).

Plaintiff gave his deposition testimony on November 20, 2012 and was denied the Trauma Support Team position in December 2012. Indeed, the parties do not dispute that Baker made the final decision to select Aoki and Kent in December – after Plaintiff's deposition. *See* Declaration of Kevin Baker ("Baker Decl.") (Dkt. 51-1) ¶ 22, Ex. 23 ("December 17, 2012 Trauma Support Selection Memorandum to All Personnel"). Therefore, Plaintiff argues, "temporal proximity is enough to raise a triable issue of fact." Opp'n to Schoonmaker at 19. However, "'a specified time period cannot be a mechanically applied criterion' for an inference of retaliation; instead, '[w]hether an adverse employment action is intended to be retaliatory is a question of fact that must be decided in the light of the timing and the surrounding circumstances.'" *Ellins*, 710 F.3d at 1062 (quoting *Coszalter*, 320 F.3d at 978).

Defendants assert that, on November 13, 2012 – before Plaintiff's deposition – the command staff, including Collins and Schoonmaker, held a roundtable and made the decision that day to recommend Aoki and Kent for the Trauma Support Team. Baker Decl. ¶ 19. Baker was present at the roundtable to observe the command's staff discussion. *Id.* Plaintiff disputes that the command staff made their recommendation on November 13; rather, Plaintiff argues the command staff made their recommendation *after* Plaintiff was deposed, and thus their decision not to recommend him was in retaliation for his speech. Specifically, Plaintiff argues that even if the command staff met on November 13,[9] they made no recommendation to Baker until November 29, 2012 – nine days after Plaintiff's deposition. To support this argument,

---

[9] Plaintiff also disputes that the roundtable during which the command staff discussed who to recommend for the Trauma Support Team took place on November 13 (before Plaintiff's deposition). To support this assertion, Plaintiff relies on Panella's deposition testimony. In his deposition, Panella initially testified he believed the Trauma Support Team recommendation was made after Edinger was deposed. Bolander Decl. (Dkt. 58-4) Ex. D ("Panella Deposition") at 67:17–20. However, later in Panella's deposition, he corrected that statement:
Q: You testified that the recommendation for trauma support was made after Officer Edinger's deposition in the Flores case. I would like to refresh your memory. If you look at Exhibit 28, you see the last paragraph on the first page?
A: Yes.
Q: Do you have any reason to believe that the date November 13, 2012 is an incorrect date for when the evaluating managers met to decide who to recommend to the chief?
A: No, that would have been accurate.
Declaration of Melanie Poturica ("Poturica Decl.") (Dkt. 69) Ex A ("Panella Deposition") at 100:18–101:3. Particularly given that Panella corrected his testimony during his deposition, the Court finds this evidence insufficient to raise a dispute about the date on which the command staff meeting occurred.

Plaintiff points to a memorandum, dated November 29, 2012, from Schoonmaker to Baker. Def. Appendix Ex. 42 ("Trauma Support Team Recommendation Memorandum"). The memorandum lists the candidates for the position, states that a meeting was held on November 13 to evaluate and discuss the candidates who applied to the Trauma Support Team, and recommends Aoki and Kent. *Id.*

Given that the command staff sent their official recommendation concerning who should be selected for the Trauma Support Team to Baker on November 29 and Baker made the final decision in December, the Court concludes that the timing of the speech and the adverse employment action could support an inference that the action took place in retaliation for Plaintiff's speech. However, the inquiry does not end there.

To survive summary judgment, Plaintiff must show "the governmental actor had knowledge of his protected speech." *Occhionero*, 386 Fed. App'x at 745. Plaintiff argues he has raised triable issues of fact as to whether Defendants knew about Plaintiff's deposition testimony before recommending Aoki and Kent. Plaintiff asserts that Panella was present at his deposition, "so an inference can and must be drawn that he disclosed the negative nature of Plaintiff's testimony to the other Commanders, and to Chief Baker, who was a named Defendant in the *Flores* case." Opp'n to City at 24. To support his argument, Plaintiff alleges that, on November 7, 2012 – prior to his deposition – Plaintiff reported to Panella he was suffering retaliation for speaking out about the alleged misconduct in the SIU, for his association with Reyes, and for statements made in his 2010 IA interview. Edinger Decl. ¶ 31. Plaintiff states Panella "expressed anger toward the Flores plaintiffs during the conversation" and that Collins approached Plaintiff later that day "and told me that Panella had told him and Deputy Chief Schoonmaker what I had said." *Id.* The Court concludes this is insufficient to show Defendants Collins and Schoonmaker had knowledge of the November 2012 deposition testimony.

However, viewing the facts and drawing inferences in the manner most favorable to the non-moving party, the Court concludes the evidence Plaintiff proffers is sufficient to support an inference that Baker was aware of the deposition testimony. Baker was named as an individual

Defendant in the *Flores* case and made the final decision about the Trauma Support Team after Plaintiff was deposed. As discussed above, because final policymaking authority was delegated to the Chief of Police with respect to collateral assignment decisions, the City may be held liable for the Chief of Police's actions. The Trauma Support Team position is a collateral assignment. *See* Declaration of William Collins ("Collins Decl.") (Dkt 51). Thus, because Chief Baker participated in this adverse action by making the final decision to select Kent and Aoki and not Edinger for the Trauma Support Team, the City may be held liable for the adverse action.

Although the Court has concluded Edinger has sufficiently established his November 2012 deposition was a substantial motiving factor in the City's decision not to select him for the Trauma Support team, summary judgment may be warranted if the City can prove it "would have taken the adverse employment action even absent the protected speech." *Ellins*, 710 F.3d at 1056 (quoting *Robinson v. York*, 566 F.3d 817, 822 (9th Cir. 2009)); *Correa v. The City of San Jose*, No. 5:12-CV-05436-HRL, 2015 WL 5559893, at *11 (N.D. Cal. Sept. 16, 2015) ("In other words, [defendants] may avoid liability by showing that the employee's protected speech was not a but-for cause of the adverse employment action.") (quoting *Eng*, 552 F.3d at 1072).

The parties do not dispute the Trauma Support Team is responsible for "help[ing] others after a traumatic incident" by "debriefing the involved personnel for the purpose of diagnosing Post Traumatic Stress." City of Westminster Statement of Uncontroverted Facts and Conclusions of Law ("City SUF") (Dkt. 47-1) No. 60. The parties also do not dispute that working on the Trauma Support Team "requires trust and the ability to maintain confidentiality." *Id.* No. 60. In his Declaration, Baker states he "did not select Edinger because of the supervisor's concerns that Edinger could not be trusted to keep information confidential, and based on the joint recommendation of the command staff at the time, as well as the best interests of the Department." Baker Decl. ¶ 20.

Plaintiff does not dispute the command staff voiced concerns about his ability to keep information confidential, *see* City SUF No. 67, but rather argues that such comments were made because of his complaints and reports of alleged misconduct, including his deposition

testimony. This argument is analogous to *Eng*, in which the plaintiff alleged "he received a low score on the promotion review in part because his record contained accusations of sexual harassment and misuse of computers – accusations *themselves* motivated by his exercise of First Amendment rights." *Eng*, 552 F.3d at 1074. Taking the plaintiff's version of the facts as true, the *Eng* court concluded the defendants had therefore not met their burden to show the plaintiff's "protected speech was not a but-for cause of the adverse employment action taken against him." *Id.*[10] The Court therefore concludes the City has not met its burden of demonstrating it would have taken the same action even absent Edinger's protected speech.[11] *See Jensen v. Las Vegas Metro. Police Dep't*, No. 2:14-CV-00029-RFB, 2015 WL 4640593, at *7 (D. Nev. Aug. 3, 2015) ("Defendants have not met their burden of demonstrating that they would have taken the same action even absent Jensen's speech"). Accordingly, the City's Motion is DENIED as to Plaintiff's claim that the City retaliated against him for his November 2012 deposition testimony by not selecting him for the Trauma Support Team.

### 4.    December 2013 Lawsuit

Defendants argue Edinger's filing of this lawsuit in December 2013 is not a protected activity and there is no proof that filing the lawsuit motivated any adverse actions.

"[W]hen government employees speak about corruption, wrongdoing, misconduct, wastefulness, or inefficiency by other government employees, . . . their speech is inherently a matter of public concern." *Alpha Energy Savers*, 381 F.3d at 926 (citation and internal quotation marks omitted). And, "[l]itigation seeking to expose such wrongful government activity is, by its very nature, a matter of public concern." *Id.* at 927. In this lawsuit, Edinger brings claims against the City of Westminster, Deputy Chief Schoonmaker, and Commander

---

[10] Similarly, in *Swanberg v. Canby*, No. 3:14-CV-00882-HZ, 2015 WL 5254373 (D. Or. Sept. 9, 2015), the defendants asserted they sufficiently demonstrated they would have "proceeded as they did regardless of whether Plaintiff had taken his protected actions years earlier" by showing that their investigation of an incident involving the plaintiff was driven by a third party complaint. *Id.* at *9. The *Swanberg* court noted those arguments did not change the conclusion that "Swanberg has produced sufficient evidence which suggests that the investigation itself could have been drive by a retaliatory motive" and that "[a] reasonable juror could find that the third party complaint provided to [individuals in police department management] the opportunity to push Swanberg out the door." *Id.* The court concluded "[d]efendants cannot rely on a potentially pretextual investigation to show that Swanberg's allegedly insufficiently handling of the March 27 incident would have inevitably led to the decision to terminate him." *Id.*

[11] Plaintiff also asserts he had more years of experience than Kent and Aoki, points to particular experiences that would make him a good candidate for the position, *see* Edinger Decl. ¶ 34, and points to testimony by other officers stating they would have no issue opening up to him.

Collins for retaliating against him for engaging in speech protected by the First Amendment. The Court therefore finds that Edinger's filing of this lawsuit is a matter of public concern. *See Boyd v. Edwards*, No. 6:15-CV-238-MC, 2015 WL 3407890, at *6 (D. Or. May 27, 2015).

The Court also concludes Edinger's lawsuit constitutes private speech. There is no question this lawsuit is speech outside the chain of command. *See id.* ("Boyd's lawsuit is also clearly outside the chain of command and constitutes private speech."). Nor was this speech made pursuant to Edinger's official job responsibilities. *See Karl*, 678 F.3d at 1071 (citing *Garcetti v. Ceballos*, 547 U.S. 410, 426 (2006)). Accordingly, the Court concludes Edinger has engaged in protected speech activity by filing this lawsuit.

The Court will therefore turn to the question of whether the filing of this lawsuit was a substantial motivating factor behind the alleged adverse employment actions. Plaintiff argues that filing this lawsuit was a motivating factor in the decisions to: (1) forward a complaint involving possible criminal conduct to the D.A.'s Office in January 2015 and, (2) give him a written reprimand in June 2015.[12] The Court will address each employment action in turn.

First, the Court will examine the decision to forward a matter concerning Edinger to the D.A. In early January 2015, Officer Steve Booth ("Booth") told Collins he believed Edinger was doing something "just not right." Defendants assert that Booth explained Edinger had "coached him" on how to fabricate injuries so that he could pursue a lawsuit against the City like Edinger. Plaintiff does not dispute that Collins informed Schoonmaker, who was then the commander in charge of the Professional Standards Unit ("PSU") and Chief Baker about Booth's statements. In January 2015, this matter was referred to the D.A.

As set out above, to show a causal link between his protected speech and the adverse action, Plaintiff "may introduce evidence that (1) the speech and adverse action were proximate in time, such that a jury could infer that the action took place in retaliation for the speech; (2) the employer expressed opposition to the speech, either to the speaker or to others; or (3) the proffered explanations for the adverse action were false and pretextual." *Ellins*, 710 F.3d at 1062 (citing *Coszalter*, 320 F.3d at 977). Plaintiff argues he has raised a triable issue as to

---

[12] Edinger does not address Defendants' arguments that he would not have been selected for the canine handler position in April 2015 even if he had not filed this lawsuit. Thus, the Court will not address the canine handler position.

whether the proffered reason for referring the matter to the D.A. was false and pretexual.[13] "A plaintiff can demonstrate pretext by showing 'weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's . . . reasons for its action,' which 'a reasonable fact finder could rationally find . . . unworthy of credence.'" *Fitzgerald v. El Dorado Cty.*, 94 F. Supp. 3d 1155, 1167 (E.D. Cal. 2015) (quoting *Hersant v. Dep't of Social Serv.,* 57 Cal.App.4th 997, 1005, 67 Cal.Rptr.2d 483 (1997)). Plaintiff argues Defendant made no attempt to investigate "what were clearly preposterous allegations against Plaintiff," and that even if the WPD did not want to handle the investigation internally, that does not explain why the WPD did not retain outside investigators instead of immediately referring the matter to the D.A. Opp'n to City at 25.

Although he argues an internal investigation should have occurred instead of an immediate referral to the D.A. and emphasizes the D.A. investigated the matter but decided not to change him with criminal conduct, Plaintiff does dispute that Booth had a duty to notify a supervisor of alleged misconduct, and that Collins had a duty to notify the PSU or Chief Baker. Indeed, Defendants argue that Baker, pursuant to Policy 1020.5 of the Police Department Policy Manual, chose to forward the information to the D.A.'s Office so that it could decide whether to take action. Baker states that once the D.A. notified him it would not charge Edinger with criminal conduct, "we closed the matter at WPD," and he used his "best judgment to decide not to pursue the matter any further." Baker Decl. ¶¶ 27–28, 31–32. Although Plaintiff disputes why Baker referred the matter to the D.A., he does not dispute Baker had the discretion to do so. Nor does Plaintiff argue Baker was required to interview Edinger or other alleged witnesses about the statements before referring the matter to the D.A.

Further, although Plaintiff emphasizes he did not make the comments to Booth and that he has never requested settlement funds from the City, he admits he did "jokingly" comment to Officer Brian Mayer that "he intended to buy a Ford Raptor with settlement funds and then drive it to the Department." Plaintiff's Statement of Genuine Disputes in Support of Plaintiff's

---

[13] This is the only argument Plaintiff makes in his Oppositions to support his argument that filing this lawsuit was a substantial and motivating factor in the decision to forward the complaint to the D.A.

Opposition to Defendant City of Westminster's Motion for Summary Judgment ("SGD Re: City Motion") (Dkt. 55-1) No. 82.

Particularly, given the evidence that alleged misconduct had to be reported to the PSU or the Chief and that Baker, pursuant to WPD policy, properly made the discretionary decision to refer the matter to the D.A., the Court concludes Plaintiff has failed to raise a genuine issue of material fact as to causation. Therefore, Plaintiff has failed to state a prima facie case of First Amendment retaliation with respect to this alleged adverse employment action.

The Court will now turn to the written reprimand Plaintiff received in June 2015. Officer Rachel Archambault, a Latina officer, filed a complaint against Edinger after he allegedly made a comment about a Mexican flag in front of her and another dispatcher and allegedly referred to a Hispanic domestic violence suspect as a "beaner." City SUF No. 99. The City hired an outside investigator who found Edinger made the comments as charged, and in so doing, violated Department policy. Id. No. 100. After reviewing the investigation findings, Commander Vu and Chief Baker issued Edinger a written reprimand.

Plaintiff argues Defendants' proffered reason for giving him a written remand is false and pretextual.[14] To support this argument, Plaintiff asserts a "witness present" exonerated him and Defendant Schoonmaker told him not to worry because the investigation would "go nowhere." Opp'n to Collins at 20. Although Plaintiff disputes he made the comments alleged in Archambault's complaint, he does not dispute that an outside investigator sustained the charges.[15] This is insufficient evidence to raise a triable issue of genuine material fact as to whether the reasons for issuing the written reprimand were false or pretextual. Plaintiff therefore has not stated a prima facie case of First Amendment retaliation with respect to this alleged adverse employment action.

## IV.   DISPOSITION

For the foregoing reasons, the Court therefore:

- GRANTS Defendant Dan Schoonmaker's Motion for Summary Judgment;

---

[14] This is the only argument Plaintiff makes to support his assertion that the filing of this lawsuit was a substantial and motivating factor in the decision to give him a written reprimand.

[15] Plaintiff also does not dispute that Schoonmaker and Collins were not involved in the decision to issue him a written reprimand.

- GRANTS Defendant William Collins' Motion for Summary Judgment;[16] and

- GRANTS IN PART and DENIES IN PART Defendant City of Westminster's Motion for Summary Judgment. Specifically, the City's Motion is DENIED as to Plaintiff's claim that the City retaliated against him for his November 2012 deposition testimony by not selecting him for the Trauma Support Team.[17]

_David O. Carter_

DAVID O. CARTER
UNITED STATES DISTRICT JUDGE

DATED: December 14, 2015

---

[16] Because the Court grants Defendants Schoonmaker and Collins' Motions, the Court does not reach Defendants' arguments that they are entitled to qualified immunity.

[17] Punitive damages are not available against municipalities in a Section 1983 suit. *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 259–71 (1981). Accordingly, the Court does not address arguments about whether Plaintiff is entitled to punitive damages.